IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: Facebook Account with Username "Worden Butler," URL: https://www.facebook.com/profile.php?id=61553280149943, UID: 61553280149943 ("**Target Account**") | Case No. 4:24 cr 00055-KDW |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Michael F. Connelly, United States Department of Justice, Federal Bureau of Investigation ("FBI") being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application for a search warrant for the stored contents and information associated with a Facebook account with the username "Worden Butler," URL: https://www.facebook.com/profile.php?id=61553280149943, UID: 61553280149943 ("**Target Account**") stored at a premises owned, maintained, controlled, or operated by Meta Platforms, Inc., doing business as "Meta" and formerly known as "Facebook Inc." (hereinafter referred to as "Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Facebook to disclose to the government the contents of information that are in Facebook's electronic storage as more fully set forth in Attachment B.

2.      Based on the below, I respectfully submit that there is probable cause to believe that the **Target Account** contains evidence of violations of 42 U.S.C. § 3631(a) (Fair Housing Act) and Title 18 U.S.C § 844 (h)(1) (Use of Fire to Commit a Felony) and § 875 (Interstate

1

Communications of a Threat) (collectively, "Subject Offenses"). During the relevant period of the Subject Offenses described herein, the user of the **Target Account** posted threats and messages related to the Subject Offenses.

3.      I am a Special Agent of the United States Department of Justice, FBI and have been so employed since July 1999. My principal duties include the investigation of, among other matters, violent crimes, drug trafficking, public corruption, and threats of violence in violation of the laws of the United States.

4.      I am a federal law enforcement officer under applicable provisions of the United States Code and Rule 41(a) of the Federal Rules of Criminal Procedure. I have received training in and have experience in the enforcement of the laws of the United States, including the preparation, presentation, and execution of search warrant.

5.      I base this affidavit upon personal knowledge and observations made during the course of this investigation, information conveyed to me by other law enforcement officers, a federal search warrant of a residence connected to this investigation, review of select body-worn camera video, interviews of witnesses, my training and experience, and my personal review of records, documents, and items lawfully obtained from third parties. This affidavit is not intended to include each and every fact known to me or the other investigating agencies, nor does it reflect all the evidence developed during the course of the investigation. Instead, I have set forth sufficient information to establish probable cause for the issuance of the requested search warrant. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part.

6.      From my training, personal experience, and the collective experiences related to me by other law enforcement officers who investigate civil rights and bias-motivated offenses, as well as offenses involving firearms and fire, I am aware of the following:

a.  Individuals who commit civil rights or bias-motivated offenses, or who conspire and collaborate with others to commit crimes based on shared bias or ideology, often have in their social media accounts photographs, communications, notes, or other electronic records that discuss their motivations for committing crimes or contain evidence of bias, such as animus towards people based on race. A preliminary review of available evidence obtained so far in this case confirms that Facebook posts on **Target Account**, as described below, contained electronic records related to threats and possible bias motivations for committing the Subject Offenses.

b.  Based on my training and experience, I know that individuals who harbor strong racial views often use text messages, Facebook, and other social media platforms to communicate their ideologies and bias motivation. Further, based on my training and experience, I know that individuals who harbor strong racial views often express those views well before committing the specific criminal conduct under investigation.

c.  Information about financial data may also identify the timing of purchases of items (for example, gasoline or other accelerants) used to facilitate these offenses, and/or sources of payments for such items.

d.  Further, I know that social media accounts are often used by certain individuals to facilitate the commission of criminal acts. I am aware that incriminating evidence

is often located within posts, messages, as well as photos and videos contained within social media accounts such as Facebook and Facebook Messenger. Additionally, social media accounts could also include contact logs (for incoming, outgoing, and missed communications), stored contact lists, indicators of deleted content, and location (IP Address) information that have proven to be valuable evidence in criminal cases.

7.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence pertaining to violations of the Subject Offenses were contained on **Target Account**. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

## BACKGROUND RELATED TO FACEBOOK AND RELEVANT TECHNOLOGY

8.    Based on my training and experience, I know the following to be true as it relates to the requested search of the **Target Account**:

   a.   Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

   b.   Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

   c.   Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will

become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

d. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

e. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

f. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

g. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

h. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

i. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

j. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

k. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

l. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

m. Facebook also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Facebook along with a timestamp.

n. Facebook retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

o. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

9. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-locations allows, for example, users to "tag" their locations in post and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in effort to conceal evidence from law enforcement).

10.    Therefore, Facebook is likely to contain the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

11.    Based on what is described herein, I submit that there is probable cause to authorize the requested search of the **Target Account** as further described below.

## FEDERAL CRIMES UNDER INVESTIGATION

12.     The FBI is investigating Worden Evander BUTLER and Alexis Paige HARNETT for the Subject Offenses. BUTLER and HARNETT (collectively, the "Subjects"), are believed to have willfully, through force or threat of force, intimidated and interfered with, or attempted to intimidate and interfere with, their Black neighbors because of their race and color and because those neighbors owned or were occupying a dwelling. Specifically, on or about November 24, 2023, BUTLER and HARNETT are believed to have burned a cross in the yard of their home for the purpose of intimidating and interfering with their neighbor's occupation and possession of the neighbor's home, and to have used threatening and racial slurs towards their neighbors both in person and on the **Target Account**. Screenshots taken by local law enforcement of the **Target Account**, as described below, indicate that evidence pertaining to these offenses was posted on Facebook on or about November 24, 2023, prior to the cross burning.

13.     *Violations of the Fair Housing Act* - Title 42 U.S.C. § 3631(a) provides, in relevant part, that "whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with— (a) any person because of his race, color, religion, sex, handicap (as such term is defined in section 3602 of this title), familial status (as such term is defined in section 3602 of this title), or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings" shall be fined under Title 18, or imprisoned, or both.

14.     *Use of Fire to Commit a Felony* - 18 U.S.C. § 844(h) provides for criminal penalties when "whoever uses fire or an explosive to commit any felony [such as 42 U.S.C. § 3631] which may be prosecuted in a court of the United States."

15.     *Interstate Communications with Threat to Kidnap or Injure* - 18 U.S.C. § 875(c) provides for criminal penalties when "whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both."

## **PROBABLE CAUSE**

### **November 24, 2023 Cross Burning at RESIDENCE A**

16.     For background, this affidavit references multiple locations and persons. For clarification, "RESIDENCE A" refers to 1400 Corbett Drive, Conway, SC 29526, the location where the cross, as described below, was burned. This residence was occupied on November 24, 2023, by the Subjects, BUTLER and HARTNETT. According to a witness, BUTLER and HARTNETT have lived at RESIDENCE A over the past year. Immediately adjacent to RESIDENCE A, is 1439 Corbett Drive, Conway, SC, hereinafter referred to as "RESIDENCE B." One of the residents of RESIDENCE B is hereinafter referred to as "Complainant."[1] Complainant owned and regularly occupied RESIDENCE B with Complainant's family. The Complainant and the other occupants of RESIDENCE B are Black, and according to the Complainant, believe they are the only Black residents living in the neighborhood. RESIDENCE A and RESIDENCE B are on adjacent lots, separated by a white fence.

---

[1] I use the term "Complainant" in order to avoid additional risk by naming the individual. Complainant is a direct witness for several of the incidents discussed in this affidavit and has been determined to be reliable and credible in that information provided has been corroborated through other interviews, a review of body camera video, and Facebook screen shots.

17.    On November 24, 2023, Horry County Police Department (HCPD) Officers responded to the RESIDENCE A based upon a report of a cross-burning. The fire was already extinguished by the time initial law enforcement responders arrived. The HCPD report indicates that Complainant observed the cross burning for several minutes before BUTLER picked up the cross, which was burning at the top, and walked around his property with it over his shoulder.

18.    Complainant has known BUTLER for more than a year and positively identified the person carrying the burning cross as BUTLER.  During this incident, Complainant heard BUTLER make comments directed to Complainant and occupants of RESIDENCE B that included the racial slur "nigger." Complainant took a photo of the burning cross on RESIDENCE A from RESIDENCE B. The photo (below) shows that the burning cross was located within feet of the fence separating the two residences and that the burning cross was clearly visible from RESIDENCE B. Complainant advised law enforcement that the cross-burning incident made Complainant and Complainant's family fear for their lives.



19.     HCPD officers reported that the Complainant advised that the occupants of the RESIDENCE A, BUTLER and HARTNETT, had "harassed and stalked them with racially motivated words and actions." While HCPD was at the scene, police encountered the Subjects at the RESIDENCE A.  BUTLER was located at RESIDENCE A during this incident and identified himself.  Shortly after, a female, later identified as HARTNETT, exited RESIDENCE A in an agitated state. BUTLER referred to HARTNETT as "Alexis" and got her to return inside the residence. Officers asked BUTLER to identify HARNETT. Rather than identifying HARNETT, BUTLER called someone he identified as "her father" who provided officers with the HARNETT's full name. Officers were able to positively identify HARNETT after pulling up her Department of Motor Vehicles photo, which matched the female who exited the residence.

20.     In order to corroborate information provided by Complainant and law enforcement, I reviewed a portion of two separate body camera videos from responding officers. The body camera videos were labeled X60AC860B and X60AC719B.

21.     Video X60AC860B, which started at approximately 8:06pm on November 24, 2023, recorded a female, later identified as HARNETT, make racial slurs during the incident. The video captures a screaming female, HARNETT, exit RESIDENCE A and yell "Go back in your fucking (unintelligible word), nigger." BUTLER stated to police that she was mentally ill.

22.     Video X60AC860B also recorded a conversation between the officer and BUTLER about the burning cross. The officer was explaining the situation to another officer in the presence of BUTLER. One officer said, "But this incident tonight that happened, apparently he (Butler) was burning a cross and it's, obviously you know who the neighbors are." BUTLER replied, "It's still a form of protest."

23.     I reviewed a portion of another body camera video from HCPD (X60AC719B). This video started at 8:03pm on November 24, 2023. The video included a conversation between an officer and BUTLER regarding the cross burning. BUTLER stated, "What was (unintelligible) that I was doing?" The officer replied, "You're burning a cross in your, your yard." BUTLER said, "And how is that illegal?" The officer replied, "Towards your neighbors who are of a different race." BUTLER said, "I don't, I was burning a fire and that's not what I was doing." The officer stated, "You burned a cross…" BUTLER interrupted, "That's fine." Then the officer replied, "…with an African American family living beside you who you have a problem with, and the fire was directed towards them." BUTLER answered, "Ok, look at the lights." BUTLER appeared to be complaining about the lights on RESIDENCE B. The officer responded, "Ok, it's not against the law."

24.     I note that BUTLER was recorded stating towards the residents of RESIDENCE B, who were present on the scene, "About my girlfriend getting in trouble, I was not trying to be mean to you." A resident of RESIDENCE B replied, "Your girlfriend called me a nigger bitch, told me to go home, but then you burn a, burn a, burn a Ku Klux Klan cross." BUTLER did not deny that accusation but did talk about on-going disputes between the occupants of RESIDENCE A and RESIDENCE B, to include BUTLER accusing them of stealing his property.

25.     The body worn camera also recorded BUTLER initially telling officers the fire was a bonfire. However, as seen on the body camera X60AC719B, when BUTLER led the officer to the location of the alleged bonfire, the officer did not see any evidence of a bonfire, such as burned wood or ashes, in the pit identified by BUTLER. I believe this indicates that BUTLER's claim that the fire observed by the Complainants and neighbors was from a bonfire is not true. The photograph of the cross-burning enclosed in this affidavit further contradicts BUTLER's claim

that the fire was a bonfire. Moreover, as described in greater detail below, a Facebook post on the **Target Account** indicated an intent to burn a cross to scare his neighbors on or about the same date on which the cross was burned on the RESIDENCE A. In my opinion, such a false statement indicates that BUTLER is aware of the historical significance of the burning cross as a hate symbol against Blacks and of his consciousness of guilt. Moreover, as described below, although BUTLER showed responding officers the location where the cross was burned, he did not show them the actual object that had been burned, instead claiming that the fire was a bonfire. I further believe these facts indicate that evidence of the burned cross was purposefully concealed from law enforcement officers at the scene.[2]

### Subject's Threats to Complainant Prior to November 24, 2023 Cross Burning

26.     Complainant advised that on or about November 23, 2023, the day before the cross burning incident at RESIDENCE A, and the same date of several threatening posts on the **Target Account** described below, two members of Complainant's family were departing RESIDENCE B when they encountered BUTLER. While trying to speak with BUTLER, HARTNETT exited the residence and said, "You niggers need to go home," "I shoot niggers," and "I shot niggers before."

27.     An FBI agent interviewed the Complainant in December 2023. Complainant stated that there were occasions when BUTLER was near their property dividing line, and he made statements to Complainant and residents of RESIDENCE B such as "Get away from here or I

---

[2]  Agents conducted a search warrant at RESIDENCE A on December 20, 2023 pursuant to a search warrant signed by the Honorable Magistrate Judge Thomas E. Rogers, III. Evidence recovered included three laptops, a Seagate Baracuda hard drive, a USB drive, and five cell phones. This electronic evidence is pending further processing by FBI personnel. Agents also recovered soil samples and a piece of rope that was located near an indentation in the soil that was found in a location generally consistent with the possible cross location on November 24, 2023. This physical evidence is also pending further evaluation. Specific physical evidence of BUTLER and HARTNETT's racial bias was not recovered the residence during the search, but collected electronic items and documents pending further analysis may contain such evidence.

might do something," and "Stay off my property or else." Furthermore, Complainant observed BUTLER walking around on RESIDENCE A on occasions swinging a machete, carrying a crossbow, and in possession of a gun in a holster on his hip. In corroboration, a machete, crossbow and a pistol/pellet gun were recovered from RESIDENCE A during the aforementioned federal search warrant on December 20, 2023. Based on the results of that search, I believe that BUTLER, as indicated by the Complainant, was in possession of weapons that could be used in furtherance of the threatening statements.

### November 24, 2023 Target Account Threat Posts

28.     The Complainant and law enforcement officers provided other evidence indicating that BUTLER and/or HARTNETT communicated threats of violence towards the Complainant and occupants of RESIDENCE B, and that those threats were made based upon their race. This evidence included statements made directly to the Complainant and screenshots of Facebook posts from the **Target Account**. I note that HCPD only obtained screen shots of the threatening posts from the **Target Account**. Furthermore, the Facebook screen shots obtained by law enforcement and the Complainant do not have a date stamp on the posts. However, I believe that these posts were actually made on or about November 24, 2023, i.e., the night of the cross burning described above, based on several facts. First, HCPD took the screen shots of the posts on approximately November 30, 2023, and those screen shots indicate that the posts were six days old on that date. Second, the Complainant was interviewed and advised they obtained copies of screen shots of the Facebook posts on or about November 27, 2023; those screenshot images indicated that the post had been made three days, i.e., November 24, 2023, prior to the date on which the Complainant

received the screen shots. The Facebook posts described below were all made on the **Target Account**.[3]

29.    On or about December 15, 2023, HCPD officers informed the FBI that they believed the posts described below were no longer publicly viewable. A preservation request was submitted to Meta on or about December 15, 2023 under Meta Case Number 8311249XX, after the posts were no longer publicly viewable.

30.    It is unclear whether the user of the **Target Account** deleted the posts entirely or whether the user made them viewable in private mode only. As noted above, based on my training and experience, Facebook maintains records that can show whether the posts have been deleted or are still viewable in private mode. If the posts have been deleted, such deletion can be evidence of consciousness of guilt. If the posts have been made private, then Facebook should be able to provide the content of those posts. If the posts were made viewable in private mode, the decision to make them private can serve as consciousness of guilt, and the content of the posts can serve as direct evidence of the crime.

31.    Notably, some of these threatening Facebook posts contain photographs of RESIDENCE B. This means that person who made the posts obtained pictures of RESIDENCE B in order to make the post. The search warrant is necessary to gather specific electronic information from those posts, and possibly other data that pertain directly to threats issued to or about the

---

[3] As detailed below, these posts appear to attribute this "Worden Butler" Facebook account to the Worden BUTLER that resides at RESIDENCE A. The profile photo of the "Worden Butler" is consistent with the mug shot of BUTLER. Additionally, the user of the "Worden Butler" account posted images of RESIDENCE B. Posts on this account also reference cross burning on or around November 24, 2023.  As of this date, the FBI is not aware of HARTNETT using or maintaining a separate Facebook account to post threatening communications.  During the search of RESIDENCE A, a computer to which both BUTLER and HARTNETT had access was recovered. Through this affidavit and warrant application, I seek authority to review the Target Account and seize indicia of user identity.

Complainant and the occupants of RESIDENCE B. The screenshots used in this affidavit were provided by HCPD.

32.    **Target Account** Threat 1: As stated, this post was likely made on or about November 24, 2023. In this post, the user of the **Target Account** states, "Going to give my racist neighbors who don't live here and you've been harassing me for three years a good scare for their health." I believe this threat was directed at the Complainant because it noted that Complainant and occupants residing at RESIDENCE B had resided there for three years (Complainant advised they moved into RESIDENCE B in approximately July 2021). The **Target Account** post also accurately noted that, as corroborated in the HCPD report, Complainant maintains residency elsewhere (HCPD report notes "out of state").



33.      **Target Account** Threat 2: This **Target Account** post indicates it occurred the same

day as THREAT 1 because it was posted six days prior to the date on which the screen shot of the

post was taken. In this post, "Worden Butler" stated, "With a cross in the lawn." I believe this post

clarifies **Target Account** Threat 1 by providing a further description of the phrase, "a good scare

for their health," by specifically referencing a "with a cross in the lawn." Furthermore, the use of

a "cross" as a method to "scare for their health" is consistent with the activities of November 24,

2023, described in this affidavit where a cross was burned on the RESIDENCE A next to

RESIDENCE B.



34.     **Target Account** Threat 3: This post indicates it occurred the same day as **Target Account** Threats 1 and 2 because it is also posted six days prior to being screen shotted. In this post, there is an image of the Complainant's mailbox in front of RESIDENCE B clearly showing the digits, "1439," i.e., the number that corresponds to the address of RESIDENCE B. The post says, "They come on holidays to start a fight with me." An individual commented on this post, "That's the way it works man." "Worden Butler" responded, "Well I'm working on summoning a devil's army and I don't care if they and I both go down in the same boat." "Worden Butler" then commented, "I'm about to make them pay." I believe these statements indicate direct threats to Complainant and family in part because of the context of this post and the reference to making them "pay," and in part because it is partially identifying the location of the Complainant's residence on a social media platform. Furthermore, I believe **Target Account** belongs to BUTLER because it provided accurate facts, specifically that the Complainant and family were in town during the holidays. Complainant confirmed to FBI agents in December 2023 that the occupants of RESIDENCE B visited RESIDENCE B on November 24, 2023. This post also indicates that the user of "Worden Butler" possibly has associates, referred to as a "devil's army," that the poster is "summoning" to assist to, "make them pay." Therefore, agents are seeking authorization for this search warrant in order to obtain evidence and other electronic communications to identify other individuals whom the Subjects may be seeking to collaborate with and/or solicit to engage in unlawful violence or threats of violence and/or who may be able to provide evidence about the Subjects' views about Blacks in general and about the occupants of RESIDENCE B in particular.




35.    **Target Account** Threat 4: This post indicates it occurred the same day as **Target Account** Threats 1, 2, and 3 because it is also posted six days prior to the date the posts were screen shotted. This **Target Account** post is a picture of RESIDENCE B, which also clearly showed two vehicles confirmed to be used by members of Complainant's family. I believe that comments by the user of the "Worden Butler" account in Threat 3 about "summoning a devil's army," "I'm about to make them pay," and posting the street number of RESIDENCE B, coupled

with posting pictures of the Complainant's house and vehicles in THREAT 4, and other verbal statements by HARNETT about shooting Black people, indicates a seriousness of purpose to convey threats of physical harm against the occupants of RESIDENCE B. In addition, these facts place the residents of RESIDENCE B at a risk of harm from individuals other than the Subjects.



36.    Based on the foregoing, I request that the Court issue the proposed search warrant to search the **Target Account** identified in Attachment A and for items described in Attachment B.

## Conclusion

37.    Based on the forgoing, I submit there is probable cause to believe that **Target Account**, which is more fully described in Attachment A, contains evidence and instrumentalities of violations of 42 U.S.C. § 3631(a), 18 U.S.C. § 875(c), and 18 U.S.C. § 844(h), as described in Attachment B.

38.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 18 U.S.C. § 2703(c).

39.    *Time and Manner of Execution:* Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

This affidavit has been reviewed by Assistant United States Attorney Elle E. Klein.

I swear, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Respectfully Submitted,

Michael Connelly
Special Agent
Federal Bureau of Investigation

SWORN TO ME IN PERSON AND SIGNED
BY ME

This 5 day of January , 2024
Florence, South Carolina

The Honorable Kaymani D. West
UNITED STATES MAGISTRATE JUDGE